UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ZURICH AMERICAN INSURANCE
COMPANY,

    Plaintiff,

v.

MIDWEST POWERLINE, INC., et al.,

    Defendants.
_____/

Case No. 1:18-cv-148

Hon. Hala Y. Jarbou

## OPINION

This is a diversity action to recover amounts owed under an insurance policy. Plaintiff Zurich American Insurance Company, a New York corporation, issued workers' compensation and general liability insurance policies to Midwest Powerline, Inc. ("MPI"), a Michigan corporation, with effective dates of March 1, 2012 to March 1, 2013 and March 1, 2013 to March 1, 2014 (collectively, the "Policies"). The Policies required MPI to make estimated premium payments, followed by an audit by Zurich that could result in a refund to MPI or additional premiums owed to Zurich. Zurich contends that MPI owes it additional premiums in the amount of $718,052.00. (*See* Compl. ¶ 44, ECF No. 1.) Zurich also sues Monaweck, Inc. ("Monaweck") and Midwest Powerline, LLC ("Midwest"), claiming that they are successors to MPI. Before the Court is Zurich's motion for summary judgment (ECF No. 51). For the reasons herein, the Court will grant the motion in part.

### I. Background

During the effective dates of the Policies, MPI temporarily hired "journeyman linemen" from Michigan to perform specific jobs involving emergency powerline repairs. (J.S. ¶¶ 2, 9, ECF

No. 51-4.)[1]  Some of those jobs were located in Michigan, but many were performed in other states, including Connecticut, Florida, Illinois, Indiana, Louisiana, Massachusetts, New Jersey, New York, Ohio, and Rhode Island.  Typically, the jobs required two-man crews and lasted for a few days or up to two weeks, including travel to and from the job site.  (*Id.* ¶ 10.)  The workers' employment lasted for the duration of their respective jobs.  After completing their assigned jobs, the workers would return to Michigan and seek other work.

The initial premiums for the Policies were based on "estimated payroll and exposure information" provided by MPI to Zurich.  (*Id.* ¶ 14.)  After the end of each of the policy terms, Zurich would conduct an audit based on "actual payroll and exposures during the effective dates of coverage."  (*Id.* ¶ 15.)  That audit could result in additional premiums or a refund.

Zurich's audits determined that MPI owed additional premiums of $718,052.00.  For the most part, MPI accepts the calculations in the audits.  It disputes only one aspect:  the rates used to calculate Zurich's exposure for liability and workers' compensation claims.  (J.S. ¶¶ 20-29.)  Zurich used the rates applicable to the states where the jobs were performed.  MPI contends that Zurich should have used only Michigan rates.  According to MPI, using Michigan rates would result in liability for only $206,539.00 in additional premium payments.

MPI has not paid any additional premiums.  Accordingly, Zurich filed this action to recover the premiums that it claims it is owed under the Policies.  Zurich sues Monaweck as a successor to MPI because MPI changed its name to Monaweck in 2015.  (J.S. ¶ 2.)  Zurich sues Midwest because Monaweck dissolved in 2017 and Midwest has continued the business of Monaweck.  (*Id.*)  For purposes of this case, Midwest does not dispute that it is a successor to Monaweck.  (*Id.*)

---

[1] "J.S." refers to the parties' Joint Statement of Material Facts.

Zurich contends that it is entitled to summary judgment on its claims for breach of contract (Count One of the complaint) and account stated (Count Three). It also contends that it is entitled to summary judgment on MPI's counterclaims for declaratory judgment and breach of contract. (*See* Answer & Counterclaims, ECF No. 5.)

## II. Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## III. Analysis

### A. Breach of Contract

The parties agree that Michigan law applies to their respective claims. "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties[.]" *McIntosh v. Groomes*, 198 N.W. 954, 955 (Mich. 1924). "[I]nsurance policies are subject to the same contract construction principles that apply to any other species of contract." *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005). Michigan courts "construe and apply unambiguous contract provisions as written." *Id.* When doing so, they "give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Id.* at 28.

The relevant portion of the workers' compensation policies provides as follows:

> A. Our Manuals
> All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. . . .

3

>B. Classifications
>Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications.  These classifications were assigned based on an estimate of the exposures you would have during the policy period.  If your actual exposures are not properly described by those classifications, we will assign proper classifications . . . .
>
>D. Premium Payments
>You will pay all premium when due. . . .
>
>E. Final Premium
>The premium shown on the Information Page, schedules, and endorsements is an estimate.  The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.  If the final premium is more than the premium you paid to us, you must pay us the balance. . . . .
>
>G. Audit
>You will let us examine and audit all your records that relate to the policy. . . . Information developed by the audit will be used to determine the final premium. . . .

(J.S. ¶ 16.)

>The relevant portion of the liability policies provides as follows:
>
>5. Premium Audit
>  a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.
>
>  b. Premium shown in the Coverage Part as advance premium is a deposit premium only.  At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. . . .

(*Id.* ¶ 17.)

As indicated, the Policies provide that Zurich uses its own rules to determine rates and classifications for MPI's workers.  Michael Berrenson, a Field Technical Director responsible for audits at Zurich, asserts in an affidavit that Zurich uses rules developed by the National Council on Compensation Insurance ("NCCI") when auditing insureds with extra-territorial employees. (Berrenson Aff. ¶ 15, ECF No. 51-1.)

4

NCCI's extra-territorial rule states:

1. Payroll of employees of contractors who have their place of business in a given state and operate also in adjoining states and who are constantly crossing state lines, but usually return to their homes each night, should be assigned to their headquarters' state.

2. The payroll for executive supervisors who may visit a job but who are not in direct charge of a job should be assigned to the state in which their headquarters are located.

3. There are contractors who maintain a permanent staff of employees and superintendents.  If any of these employees or superintendents are assigned to a job that is located in a state other than their headquarters' state, either for the duration of the job or any portion thereof, their payroll should be assigned to the highest rated of either the state in which the job is located or the headquarters' state.

4. The payroll of employees who are hired for a specific job project should be assigned to the state in which the job is located.

(*Id.* ¶ 17.)

Relying on part 4 of NCCI's extra-territorial rule, Zurich assigned the payroll of MPI's temporary contractors to the states in which their jobs were located.  Relying on part 3 of the rule, if any of MPI's *permanent* employees worked on a job outside Michigan, Zurich used the rate of the state in which the job was located, if higher than the rate in Michigan.  (*See id.* ¶¶ 18-20.)  Also, Berrenson avers that, for insurance claims generally, the state in which the work is performed "is the state in which the exposure of risk lies."  (*Id.* ¶¶ 26, 50.)

In short, the Policies expressly permit Zurich to use its own rules when calculating premiums.  Those rules include NCCI's extra-territorial rule, which assigns the payroll of temporary employees like those hired by MPI to the states in which they performed their work.

MPI insists that Zurich should have used Michigan rates for its hires because workers' compensation is governed by state law.  In Michigan, the Michigan Workers' Compensation Agency issues its own rules and regulations for workers' compensation.  According to MPI,

5

Michigan does not follow the NCCI's rules. However, MPI does not identify a Michigan rule that would lead to a different result. Moreover, its argument ignores the fact that the terms of the Policies govern MPI's premiums. Those policies permit Zurich to select the rules by which it would determine the applicable rates and classifications. It is not disputed that Zurich selected the NCCI's rules. If MPI had wanted different rules to apply, it could have said so in the insurance contracts.

The same logic defeats MPI's argument that Zurich should have applied guidelines issued by the Premium Audit Advisory Service ("PAAS"). The PAAS's guidelines are not part of the Policies, and there is no evidence that they are part of the rules adopted by Zurich for determining the rates of out-of-state workers. And in any case, the PAAS guidelines support Zurich's position. They state that "[i]ndividuals hired exclusively to work at [a] particular job site should be assigned to the state where that job is located." (*See* ECF No. 52-2, PageID.690.) MPI hired its repair workers "to perform specific, temporary jobs" in other states. (J.S. ¶ 10.) Under the guidance provided by PAAS, those workers should be assigned to the states where their jobs were located, which is what Zurich did.

In addition, it is irrelevant that MPI's previous insurers purportedly used Michigan rates for MPI's out-of-state workers. The policies issued by those insurers are not at issue here, and they are not relevant for interpreting the policies issued by Zurich.

MPI also contends that Zurich never assumed any real risk of exposure to claims filed in other states because Michigan law permitted MPI's workers to file workers' compensation claims in Michigan for any injuries they suffered in other states. *See* Mich. Comp. Laws § 418.485. In addition, while the Policies were in effect, none of MPI's workers filed a claim for workers' compensation. However, the Court's job is to interpret the Policies as written; the Court need not

consider whether it was wise for MPI to obtain insurance that, in hindsight, was not necessary. Moreover, MPI does not meaningfully respond to Zurich's point that Zurich did, in fact, assume the risk of claims filed in other states because, if MPI's temporary workers were injured on the job, they could have filed claims in the states in which they were injured.[2] And in any case, the terms of the Policies govern, not Michigan law.

Finally, MPI relies on language in the Policies requiring Zurich to use the "proper classifications and rates that *lawfully apply* to the business and work covered by [the] policy." (J.S. ¶ 16 (emphasis added).) However, MPI fails to explain why the rates used by Zurich do not "lawfully apply." Michigan rates are not mandated by law in these circumstances, and so far as the Court is aware, there is nothing unlawful about Zurich's application of out-of-state rates to MPI's workers.

In summary, the Policies permitted Zurich to use its own rules when determining the rates and classifications for MPI's workers. Those rules directed Zurich to apply out-of-state rates. No evidence supports MPI's contention that the Policies obligated Zurich to use Michigan rates. Thus, there is no genuine dispute that Zurich properly calculated the additional premiums owed by MPI to Zurich under the Policies.

There is also no genuine dispute that MPI breached the contract by failing to pay these additional premiums, and that Monaweck and Midwest are liable for these premiums as successors to MPI.

Likewise, there is no genuine dispute that Zurich did not breach the parties' contract by attempting to charge out-of-state rates, as MPI contends in its counterclaim. (*See* Answer &

---

[2] The fact that Michigan's workers' compensation statute provides that Michigan's "workers compensation agency *shall* have jurisdiction over all controversies arising out of injuries suffered outside [Michigan]" by Michigan residents working for Michigan employers, Mich. Comp. Laws § 418.815 (emphasis added), does not necessarily mean that Michigan has *sole* and *exclusive* jurisdiction over such claims.

7

Counterclaim, ECF No. 5, PageID.49.)  Accordingly, Zurich is entitled to summary judgment on its claim for breach of contract as well as MPI's counterclaim for breach of contract.

For the same reasons, Zurich is entitled to summary judgment on MPI's counterclaim for declaratory judgment, which asks the Court to "declare the rights, duties and obligations of the parties" under the Policies and to award MPI any additional relief to which it may be entitled.  (*See id.*)  The Court finds that the Policies obligate Defendants to pay the additional premiums claimed by Zurich.  Defendants are not entitled to relief.

### B. Account Stated

Under Michigan law, "[a]n 'account stated' is a balance struck between the parties on a settlement; and where a plaintiff is able to show that the mutual dealings which have occurred between the parties have been adjusted, settled, and a balance struck, the law implies a promise to pay that balance."  *Klochko Equip. Rental Co. v. Village Green Constr., LLC*, No. 235599, 2003 WL 21398305, at *2 (Mich. Ct. App. June 17, 2003) (quoting *Keywell & Rosenfeld v. Bithell*, 657 N.W.2d 759, 777 (Mich. Ct. App. 2002)).

> The material question involved in the determination of whether an account presented constitutes an account stated is the ascertainment of the balance due, and the admission of its correctness.  The parties must understand it to be a final adjustment of the demands between themselves, and it must receive the assent of both parties as to its correctness.

*Pelavin v. Fenton, Davis & Boyle*, 239 N.W. 268, 269 (Mich. 1931).

Zurich can prove its account stated claim by showing that MPI accepted the amount due under the Policies.  That acceptance can be shown by express conduct or "by a failure within a reasonable time to question the state of the account as presented[.]"  *Corey v. Jaroch*, 100 N.W. 957, 958 (Mich. 1924).  Zurich has not made that showing.  Accordingly, Zurich is not entitled to summary judgment on its claim for account stated.

## IV. Conclusion

For the reasons stated, Zurich is entitled to summary judgment on its claim for breach of contract against Defendants, and on MPI's counterclaims. Zurich is not entitled to summary judgment on its claim for account stated. Thus, the Court will grant the motion for summary judgment as to Count One of the complaint. Counts Two and Three of the complaint, i.e., unjust enrichment and account stated, remain unresolved.

Counts Four and Five claim "successor liability" against Monaweck and Midwest. Zurich did not expressly seek summary judgment on the latter counts, but judgment on those counts necessarily follows from the facts. Monaweck is legally the same entity as MPI. The name change from MPI to Monaweck does not release Monaweck from MPI's debts and obligations. Also, Defendants acknowledge that Midwest is a successor to Monaweck. Thus, Midwest is liable for MPI's debt under the Policies. Accordingly, the Court will grant summary judgment on the latter counts as well.

An order and partial judgment will enter in accordance with this Opinion.


Dated:   March 12, 2021                                         /s/ Hala Y. Jarbou
                                                                HALA Y. JARBOU
                                                                UNITED STATES DISTRICT JUDGE